John Bridge v. Commissioner.
Bridge v. Commissioner
Docket No. 9679.
United States Tax Court
1948 Tax Ct. Memo LEXIS 205; 7 T.C.M. (CCH) 249; T.C.M. (RIA) 48073; April 28, 1948
R. M. O'Hara, Esq., William F. Robinson, Esq., and Harry A. Smith, C.P.A., 1126 Dime Bldg., Detroit 26, Mich., for the petitioner. A. J. Friedman, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: The deficiency herein is for income tax in the amount of $83,980.23 for 1941. The issue is whether the petitioner received $169,500 of ordinary income in a transaction involving sale of stock. The evidence consists of testimony, exhibits and a stipulation of facts. The stipulated facts are incorporated in our findings of fact by reference and will be included with the facts found from other evidence, in our Findings of Fact Petitioner, a resident of Detroit, Michigan, kept his records and filed his *206 returns on the cash basis. His return for 1941 was filed with the collector at Detroit, Michigan. In April 1932, while acting as receiver for the Interstate Motor Freight Corp., petitioner sold the assets of the corporation to Harry Bylenga, hereinafter referred to for convenience as Bylenga, who owned a majority of the corporation's stock. The Interstate Motor Freight System, hereinafter referred to as Interstate, was organized the next month under the laws of Michigan, with a capital stock of 10,000 shares of common, par value $10 each, and in November 1932 acquired title to the property purchased by Bylenga from the receiver. Petitioner was immediately employed as general manager and vice president of Interstate, and for about three years received as compensation for his services, a salary and a percentage of the corporation's income. Bylenga has at all times been president of Interstate. The business of Interstate has at all times been that of hauling freight by motor truck in interstate and intrastate traffic. At first Interstate served two cities in Ohio, two in Indiana, three in Michigan and Chicago, and had gross revenue of about $300,000 a year. By June 1935, when motor *207 carriers first came under the supervision of the Interstate Commerce Commission, Interstate was operating over about 15,000 miles of routes in the northeast and north central sections of the United States, extending from Boston to St. Louis and Minneapolis, it was granted permission by the Interstate Commerce Commission to operate over the routes it was using at that time. Additional operating territory thereafter could be obtained only by permission of the Interstate Commerce Commission. An agreement executed by petitioner and Bylenga on March 30, 1935, recited that the business of Interstate had been developed by capital furnished by the Star Transfer Line, a corporation, the majority of whose stock was owned by Bylenga, and by the joint efforts of the parties thereto, and that they desired to adjust in a satisfactory manner "their holdings" of stock of Interstate then outstanding in the name of Bylenga, and arrive at an agreement respecting ownership, control and operation of the corporation and salaries to be paid to them. The contract gave petitioner an option to purchase from Bylenga 1,265 shares of common stock of Interstate for $10,000, and provided that Bylenga would cause *208 petitioner to be elected one of the five directors and vice president and general manager of Interstate, and that each should receive as compensation from Interstate a salary of $800 a month. The petitioner agreed that if he exercised the option he would not sell or dispose of the stock without giving Bylenga an option for a period of 30 days to purchase the stock from him at the offering price and terms. The option given petitioner was exercised and the purchase price of $10,000 was paid by him on or before August 8, 1936, on which date two certificates, aggregating 1,265 shares, were issued to petitioner. George S. Norcross, a member of the law firm of Warren, Norcross & Judd, Grand Rapids, Michigan, which was general counsel for Interstate and the Star Transfer line, was secretary at all times of Interstate and for a number of years a director. He was counsel for Bylenga from 1917 until the latter's death in 1944, and at times was attorney for petitioner. Norcross kept the stock book of Interstate in his law office. The two certificates issued in the name of petitioner were issued and signed in Norcross' law office, placed in an envelope marked "Stock of John Bridge" and deposited *209 in the safe of the firm. On November 25, 1938, Norcross notified petitioner by letter that stock certificate No. 4, for 900 shares of the stock had never been delivered to him and suggested that he should obtain it the next time he called at the office. The petitioner was under no obligation to leave the certificates with Norcross, and left them with him for safekeeping. The certificates were in the custody of Norcross at all times thereafter until disposed of in the transaction giving rise to the issue involved herein. The remaining 4,235 shares of common stock of Interstate outstanding were recorded in the names of the following persons until November 10, 1941: Stockholder
Shares
Harry Bylenga
3,388
Cornelius Bylenga, Jr.
247
Edwina S. Bylenga
600
In 1938 Interstate issued 2,000 shares of 7 per cent cumulative preferred stock, par value $10 each. The operating revenue and net income of Interstate for the years 1936 to 1941, inclusive, and earned surplus at the close of each of such years, were, in round numbers, as follows: Operating
Net
Earned
Revenue
Income
Surplus
1936
$ 3,224,000
$140,528
$196,896
1937
3,651,000
5,737
92,907
1938
3,950,000
121,297
196,274
1939
6,589,000
323,726
463,392
1940
9,907,000
103,602
628,833
1941
13,144,000
113,242
745,733
*210 Bylenga had his office in Grand Rapids, Michigan, and confined most of his duties to financial and accounting matters. Very little of his time was devoted to contacting shippers, and operating policies and problems. Petitioner, as general manager, directed the operating department of Interstate. Many motor truck freight carriers operate with their own trucks; others use leased equipment and some employ both methods of operation. Prior to 1939, Interstate operated equipment leased from individual owners. In 1939, when Interstate was serving about 33,000 shippers, each of the individual owners of the equipment, at the suggestion of petitioner, organized a corporation to hold title, to his trucks and placed all of the corporation's voting stock in the hands of petitioner as trustee, in order to give him control of the equipment. Fifty-seven of such corporations were organized. The arrangement gave Interstate closer control over fleet owners, eliminated some potential labor problems, and otherwise was advantageous to it. That method of acquiring and controlling equipment was originated by petitioner. Petitioner was one of the leaders and most competent operating executives in the *211 motor carrier transportation business. In 1936, 1937 and 1938, petitioner and Bylenga each received a salary of $12,000, $14,590.65 and $25,000, respectively, from Interstate. In 1939 the salary of Bylenga was $17,327.20, and petitioner's was $25,000. Petitioner always considered that it was against his interest to be a minority stockholder of Interstate and desired to increase his holdings of such stock. On numerous occasions he discussed with Bylenga the matter of sale by Bylenga of more of his stock to him. Bylenga gave petitioner verbal promises to sell him more stock, but the promises were never reduced to writing. One of such promises was made a short time before November 2, 1939, when petitioner intimated to Bylenga that he would not continue as manager of Interstate unless a more equitable distribution of the stock was made. Petitioner was of the opinion that he was not being properly rewarded for the services he had performed and was performing and was entitled to a greater part of the earnings of the corporation. Bylenga declined to sell petitioner additional stock, and petitioner, without receding from his opinion that he should have a larger proportion of the stock *212 of Interstate, was obliged to agree to other arrangements to compensate him, which were incorporated in an agreement entered into with Interstate and Bylenga on November 2, 1939. The contract of November 2, 1939, provided for the employment of petitioner in his then capacity for a period of five years from January 1, 1940, subject to discontinuance at any time by petitioner or Interstate on 30 days notice, at an annual salary of $25,000 and 25 per cent of the net earnings of Interstate, which were defined as net income after deduction of all operating expenses but without any deduction for Federal income taxes. It gave Interstate and Bylenga, or either of them, an option, exercisable during the employment period, to purchase all but not less than all of petitioner's 1,265 shares of common stock of Interstate for $210,000, payable in four equal annual installments of $52,500, commencing 60 days after the obligation to purchase arose, with interest at the rate of 5 per cent per annum. In the event Interstate discontinued the employment by giving 30 days notice, the corporation was obligated to purchase the stock at the same price and on the same terms. In the event petitioner should *213 die or Interstate terminated the official relations ofpetitioner with it without his consent during the five-year period, Interstate or Bylenga, or both of them, were obligated to purchase the stock for the same price and on the same terms of payment. The petitioner agreed to take out a term policy of insurance on his life in such form and with such insurer or insurers as Interstate approved, with Interstate named as life or death beneficiary, Interstate to pay the premiums so long as it had a contingent obligation to purchase petitioner's stock and to keep the insurance in force for the purpose of providing additional security or guaranty for the performance of its obligation in the event it became obligated to purchase the stock. Petitioner also agreed in the contract to deposit certificates for the 1,265 shares of stock with the Michigan Trust Co., trustee, endorsed for transfer in the name of the trustee and to be held by it for delivery to Interstate or Bylenga, or both of them, in the event of its, his or their purchase of the shares in accordance with the agreement, or for transfer to petitioner at the expiration of the contract in the event Interstate or Bylenga did not elect *214 or become obligated to purchase the stock. The contract contained a provision reading: "* * * It is understood that any and all dividends which may be declared either in cash or stock upon said shares in the hands of the Trustee, together with any additional disbursements or shares arising by reason of the ownership of said deposited shares, shall be paid and delivered to said Trustee, and shall thereupon be treated and considered as a part of the original 1265 shares. * * *" Any taxes on the stock or dividends thereon or otherwise arising by reason of the trust were to be paid by the trustee out of funds of the trust. The agreement recited that powers and duties of the trustee were more fully defined in a trust agreement of that date between petitioner and the trustee. Another provision of the agreement provided that stock then held by petitioner in the Central Michigan Trucking, Inc., and his interest in Eastern MichiganFreight Lines should be treated as part of the 1,265 shares of stock of Interstate. The agreement of November 2, 1939, was ratified by the stockholders and directors of Interstate on the date of its execution. Bylenga refused to sign the trust agreement provided *215 for therein because of the pendency of negotiations with Kuhn, Loeb & Co. for the sale of all of the stock of Interstate and the shares of stock, as hereinbefore related, were at all times important in the possession of George S. Norcross. In November 1939, Interstate applied for and was issued life insurance on petitioner in the total amount of $210,000. The premiums in the policies were paid by Interstate and a portion thereof was charged to petitioner. The amount of the insurance was never increased. The purpose for taking out the insurance was to insure the availability of funds for the purchase of petitioner's stock in the event of petitioner's death. About January 1, 1940, negotiations were started by petitioner and Bylenga with Burge M. Seymour, representing Kuhn, Loeb & Co. and others, for the sale of all of the stock of Interstate in connection with a merger of motor transport companies into a new corporation to be known as Central Transport Co. En route to New York to confer with Seymour for the first time the next day, Bylenga informed petitioner that he wanted petitioner to have the full value of his stock in the negotiations and that he would waive his option rights *216 for the period of the negotiations. Petitioner assumed that Bylenga was speaking for himself and Interstate. Petitioner concluded from the conversation that the option was no longer in effect with respect to his sale to Bylenga or Interstate at the option price. There was no discussion about petitioner's right to require Bylenga or Interstate to purchase the stock at the option price in the event Interstate terminated his services or the rights of his estate with respect to the option. In his conversations at that time, and later with Seymour, petitioner dealt with the 1,265 shares of stock of Interstate as the absolute owner thereof. Seymour was not advised of the option by any one. Seymour and petitioner had an understanding that the latter would become the president of the new corporation at a salary of between $50,000 and $75,000 a year. Compensation to petitioner based upon net income of the new corporation was not discussed. No amount as salary to petitioner was actually determined. A commitment to petitioner to become the executive head of Central Transport Co. was an important factor in the merger plans and petitioner felt that the success of the merger, if made, depended upon *217 his being identified with it as manager with authority to operate it. The negotiations continued and in the summer of 1940 petitioner negotiated for the purchase of carriers in the central west. Seymour did not desire to assume petitioner's employment contract and during the course of the negotiations petitioner voluntarily agreed with Semour to cancel the contract in connection with the transaction in order to create a public market for stock of Central Transport Co. petitioner did not use his employment contract with Interstate as a bargaining point in the negotiations, and there was no discussion between petitioner and Seymour about the payment of consideration to petitioner for canceling the agreement. The part of the plan of importance to petitioner was the public market the merger would create for securities of the new corporation. Seymour was not aware at any time during the negotiations of the existence of an option on petitioner's stock. The negotiations resulted in an understanding on October 11, 1940, to be used as the basis for preparing instruments for the purchase by the Central Transport Co. of all of the stock of Interstate and other corporations owned or controlled *218 by it or petitioner and Bylenga, including the Eastern MichiganFreight Lines, subject to the approval of the Interstate Commerce Commission and other conditions, for $3,470,000, of which $900,000 was to be paid to petitioner for his stock of Interstate and other corporations and $2,153,000 to Bylenga. Of the total consideration, about $2,500,000 was for the stock of Interstate. The amount was arrived at by adding net worth to five or six times earnings, which were adjusted upward to reflect the compensation paid petitioner on the basis of earnings. The intention was to sell securities of Central Transport Co. to the public through Kuhn Loeb & Co. Petitioner reserved the right to decline to complete the transaction if he was not satisfied concerning the amount of his tax liability arising from the sale. The plan was abandoned after the Interstate Commerce Commission denied in November 1940 an application for a similar merger of other corporations. In the summer of 1941 petitioner initiated negotiations with Otis & Company, investment bankers and underwriters of Cleveland, Ohio, in which Bylenga subsequently joined, for the sale to it of the stock of Interstate. It was contemplated *219 that Otis & Co. would make a public offering of the shares and stock of other corporations in a merger. Petitioner voluntarily agreed to cancel his employment contract with Interstate in connection with the plan, for the reason that he desired to have a public market created for the stock he owned and expected to acquire in the transaction. Otis & Co. informed him that it would not be good business for it to offer the stock to the public with such an agreement in existence. The agreement was not used by petitioner as a bargaining point for the sale of his stock. Otis & Co. suggested to petitioner that if his employment contract with Interstate were canceled, he would be entitled to some form of compensation to reward him for his extra services, such as dividends on stock of the corporation. Petitioner was to be president of the new corporation at compensation comparable to what he had been receiving and would be given an opportunity to acquire an option on stock when a merger occurred. The negotiations resulted in a conditional offer of Otis & Co. to Bylenga, as set forth in an unsigned letter written in September 1941, for the signature of Bylenga. The offer would not have been *220 made without a cancellation of petitioner's employment contract. The offer of Otis & Co. provided, among other things, for the acquisition by Interstate for retirement of the 847 shares of stock held by Cornelius and Edwina S. Bylenga; the retirement of its preferred stock, changing its capital structure to 300,000 shares of common stock, par value $1 each, the issuance of 160,000 shares of the new stock for the 4,653 shares of stock held by petitioner and Bylenga, and for the sale to Otis & Co. of 112,000 of the 160,000 shares by Bylenga for $8.50 a share for sale to the public at $10 a share. The offer provided that if it was accepted, the agreement to sell would be based upon the capital gains provisions of the Revenue Act of 1941, as passed by the Senate on September 5, 1941, and if the law was amended so as to increase the taxes payable by Bylenga he was to be relieved of his obligations under the agreement. Petitioner had an understanding with Otis & Co. that he would retain all or the major proportion of the new stock he was to receive, and that any shares sold to Otis & Co. would be at the price of $8.50 a share. The price of $8.50 for the proposed new stock was equivalent *221 to about $300 a share for the 4,653 shares held by petitioner and Bylenga. Bylenga verbally agreed with petitioner to accept the offer but informed him a few days later that he would not complete the transaction. He refused to give petitioner a reason for his final conclusion. The salary of Bylenga in 1940 and 1941 was $45,000 and $25,480.75, respectively. The salary of petitioner for 1940, and to November 1, 1941, was $91,993.57 and $95,662.95, respectively, including compensation, based upon earnings of $66,993.57 in 1940 and $70,182.20 in 1941. On November 1, 1941, there had been credited to petitioner as contingent compensation for 1941, the amount of $110,304.04, of which $101,253.57 had been withdrawn. In a final account with petitioner in 1942, following an audit of the books of Interstate, the amount of compensation based upon earnings was reduced to $70,182.20. Until November 1, 1941, petitioner devoted all of his time to the affairs of Interstate. Petitioner and Bylenga were not in accord on many matters involving operating policies of Interstate, including the purchase of equipment, which petitioner favored, in view of which, and other matters, including high taxes *222 on his compensation, questionable future of the business and the refusal of Bylenga to enter into the contract with Otis & Co., petitioner decided in October 1941 to sever his connection with Interstate, including the cancellation of his employment contract, and so advised Bylenga. Petitioner, rather than continue under his contract without making any progress, preferred to enter the service of another motor transport carrier or engage in new or additional enterprises, in which activity or activities he thought he could earn as much as the amount he was then receiving from Interstate. He always wanted a larger stock interest in Interstate. Petitioner told Bylenga that Bylenga should purchase his stock and that he considered a fair selling price to be $300 a share, that amount being the approximate amount offered by Otis & Co., and verbally accepted by Bylenga. Petitioner gravely doubted whether there would be any value to his employment contract if Bylenga persisted in carrying out his policies, contrary to those of petitioner. Bylenga did not desire petitioner to cancel his employment contract or sell his stock and never informed petitioner that he wanted him to cancel the employment *223 contract of November 2, 1939. The desire of Bylenga was that petitioner not make an abrupt severance of his connection with Interstate and that he remain with Interstate in an advisory capacity as chairman of the board of directors, a position to be created, at a salary conditioned upon an agreement not to compete as part of the consideration. Petitioner discussed his employment contract of November 2, 1939, with Norcross on many occasions before and after it was reduced to writing. Norcross informed petitioner the contract was not a good one for him and that it was less good for Interstate, because the tax on the income was burdensome to petitioner and it took funds from Interstate that were needed for expansion of their operations. During the time petitioner's employment contract of November 2, 1939, was in effect no dividends were paid on the common stock of Interstate and only small dividends were paid on the stock at any time. The negotiations between petitioner and Bylenga concerning the former's connections with Interstate resulted in a written offer on October 23, 1941, from petitioner to sell his 1,265 shares of stock of Interstate to Bylenga for $300 a share, a total *224 of $379,500. There was to be included with the stock, without additional consideration, all stocks of subsidiary corporations, including fleet, gasoline and equipment corporations, the Central Michigan Trucking, Inc., and Eastern MichiganFreight Lines, excepting Acme Truck Rentals and System Service, Inc., the latter of which petitioner agreed to liquidate as promptly as possible. Petitioner gave Bylenga an option, exercisable in two years, to purchase his stock of Acme Truck Rentals at a price equal to his actual investment in the securities. He agreed to cancel his employment contract as of November 1, 1941, and to enter into another such contract, effective on that date, for a period of five years for the performance of such duties of an executive nature as are usually performed by the chairman of a board of directors, at a salary of $25,000 a year. Petitioner also agreed that he would not engage or be interested, directly or indirectly, in any business in competition with Interstate or any business having dealings with Interstate, except Acme Truck Rentals and System Service, Inc., until its dissolution. He reserved the right to cancel the contract any time when Bylenga or his *225 estate ceased to hold in excess of 50 per cent of the stock of Interstate or ceased to be in actual control of the corporation. The offer was accepted by Bylenga on October 30, 1941. The stock of corporations other than Interstate, included in the sale, were fleet ownership corporations, all of whose stock was owned by System Service, Inc., and System Equipment Corporation. All of the stock, except possibly System Equipment Corporation, was acquired by petitioner with funds of Interstate, and without cost to petitioner, and he was advised by counsel that he held it as trustee. System Service, Inc., serviced the operations of the 57 fleet owner corporations. Petitioner did not consider that any part of the consideration for his stock of Interstate was for stock of these corporations. Acme Truck Rentals was a corporation formed by petitioner to own and operate trucking equipment for the purpose of determining whether underpayments were being made to fleet owners who were performing services for Interstate. Prior to November 1, 1941, Bylenga discussed with Norcross and David A. Warner, a member of the law firm of Warner, Norcross & Judd, the matter of the option and petitioner's employment *226 contract. They advised Bylenga that in accordance with provisions of the option agreement he could purchase petitioner's stock for $210,000. Norcross never had any information concerning a modification of the option provision in the agreement. The employment contract of petitioner, including cancellation thereof, was not discussed or used as a bargaining point by petitioner in connection with the sale of his stock to Bylenga. Petitioner did not consider the option agreement to be binding upon him at that time. The employment contract was canceled at the request of petitioner. Petitioner did not in any of his dealings with Bylenga ask that he be paid for the cancellation of his employment contract, and did not intend any part of the consideration of $379,500 as consideration for the cancellation. The willingness of petitioner not to compete with Interstate, and to serve as chairman of the board of directors, was not mentioned as a consideration in fixing the price of the stock. In all of the transactions involving the sale of his 1,265 shares of stock, petitioner regarded himself as the absolute owner thereof. Bylenga, prior to the commencement or completion of his negotiations *227 with petitioner for acquisition of the 1,265 shares of stock, discussed with Henry N. Battjes and Titus W. Hager the matter of their purchase of some of the shares. Petitioner was advised of the negotiations by Bylenga and about October 23, 1941, discussed the matter with Battjes and Hager, at their request. He never negotiated with them the sale of any of his stock and informed them that he was selling his stock to Bylenga and if they desired to purchase the stock it would be necessary to acquire it from Bylenga. They inquired of petitioner whether he would cooperate with them in the event they purchased shares of the stock and were elected directors of Interstate. While petitioner and Bylenga were negotiating the stock transaction, petitioner planned to participate, with his sons, in the Carter's Insurance Agency and was negotiating for the purchase of a dairy property in Flint, Michigan. Petitioner abandoned the plans after the outbreak of war. On November 10, 1941, Bylenga drew his check for $379,500 to the order of petitioner. The check was deposited to his account and paid by the bank on November 15, 1941. On the same day petitioner delivered his 1,265 shares of stock to *228 Bylenga. On November 10 and 14, 1941, Battjes and Hager issued their checks for $100,000 each. The checks were deposited to the account of Bylenga and were paid by the banks, those of Battjes on November 14, 1941, and those of Hager on November 15, 1941. The stock book of Interstate discloses that the certificates for 1,265 shares of stock issued to petitioner on August 8, 1936, were canceled as of November 10, 1941, on which date a certificate for 333 1/3 shares was issued to Henry N. and Bessie Battjes, and a certificate for a like number of shares to Titus W. and Frances Mae Hager. On November 10, 1941, Interstate gave Bylenga its check for $179,500 for 598 1/3 shares of its stock. The check was deposited to the account of Bylenga and was paid by the bank on November 14, 1941. At a special meeting held on November 21, 1941, attended by Bylenga, petitioner, Hobart Schaibly and Norcross, the directors of Interstate accepted, after electing Battjes and Hager as members, an offer of Bylenga to sell 598 1/3 shares of its stock, together with a 47.3 per cent interest in certain fleet corporations of Interstate, for $179,500 and directed that the stock be placed in the treasury of *229 Interstate. The cost of the 598 1/3 shares of stock was charged in November 1941 to an account entitled "Treasury Stock." In November 1942 the stock was retired and the transaction was recorded in the books of Interstate by charging the account for capital stock with $5,983.33, the par value of the stock, and surplus with $173,516.67. In January 1942 Bylenga informed petitioner that the business of Interstate was decreasing and requested him to resume his former connection with the corporation at a salary of at least $75,000 a year. Petitioner declined the offer because of inability to work with a committee which Bylenga had set up to operate Interstate. The employment contract of November 10, 1941, was the result of understandings reached by petitioner and Bylenga as part of the stock transaction. Bylenga desired to have petitioner available for counsel and advice and was particularly anxious to continue the account of the National Carloading Corporation, representing more than 25 per cent of the business of Interstate, with officers of which petitioner was very friendly. Petitioner performed substantial services for Interstate under the contract during the first few weeks after *230 it was executed. On the same day, November 10, 1941, petitioner and Interstate entered into a contract under the terms of which Interstate employed petitioner to act as chairman of its board of directors and to perform such duties of an executive nature, under the direction of the board of directors, as are usually performed by the chairman of a board, for a term of five years, commencing November 1, 1941, at an annual salary of $25,000. Petitioner agreed not to engage or be directly or indirectly interested in any business in competition with Interstate or any business having dealings with Interstate, except Acme Truck Rentals, Inc., System Service, Inc., and International Highway Forwarders, Inc., and discontinue all association with the latter upon request of Interstate. Petitioner was given the right to cancel the agreement in the event that at any time Bylenga or his estate ceased to own more than 50 per cent of the outstanding stock of Interstate or should cease to be in actual control of the corporation. In February 1942 petitioner became associated with the Federal Government in Chicago and later was transferred to Washington, where he served in an advisory capacity in *231 the War Department until May 1943. As a consequence of such duties Bylenga expressed a desire to alter the employment contract of November 10, 1941. Negotiations on the question resulted in the cancellation on August 4, 1942, by petitioner of the employment contract of November 10, 1941, which was accepted by the directors of Interstate on August 11, 1942, and the execution on about August 15, 1942, of a new contract of employment, under the terms of which petitioner was to continue to serve as a director and chairman of the directors, performing such duties as were indicated from time to time by Bylenga, at a salary of $20,000 per annum, subject to cancellation by either party on 30 days' notice. Later, in 1942, Bylenga conducted negotiations for the sale of Interstate, in connection with which the prospective purchaser and Bylenga discussed with petitioner the matter of becoming manager of the business at a salary of not less than $75,000 a year. Petitioner refused to accept the offer on account of Bylenga's continued association with Interstate. The contract was terminated by a written notice given by petitioner on April 1, 1943. The cancellation relieved petitioner of his obligation *232 not to compete with Interstate. The business with which petitioner has been associated since 1943 is in direct competition with Interstate. In his return for 1941 petitioner reported capital gain of $369,500 on the sale of his 1,265 shares of stock of Interstate, based upon cost of $10,000 and selling price of $379,500, one-half of which he included in income subject to tax. In his determination of the deficiency the respondent determined that $169,500 of the amount received by petitioner was taxable as ordinary income under section 22(a) of the Code; that the remaining amount of $210,000 constituted consideration received for the stock and since the cost thereof was $10,000, capital gain had been realized in the amount of $200,000, one-half of which was subject to tax. Opinion The disagreement of the parties relates to $169,500 of the consideration paid under the transaction between petitioner and Bylenga in November 1941, in which the former sold his stock of Interstate to the latter. The petitioner contends that the consideration of $379,500 was paid exclusively for the stock and respondent argues, as he determined when computing the deficiency, that only $210,000, the option *233 price provided in the employment contract of November 2, 1939, was paid for the stock, and that the remainder of $169,500 was received by petitioner for relinquishing his right to compensation for services rendered, based upon net earnings of Interstate. The question is one of fact and is discussed at great length by the parties upon brief. No useful purpose would be served by referring to and discussing all of the views of the parties. A brief statement of some of the material facts will be helpful. Petitioner entered the service of Interstate in 1932, when it was organized. The yearly operating revenue of Interstate increased from about $300,000 in 1932 to $3,224,000 in 1936. In March 1935 petitioner asserted a right to own stock of Interstate, which Bylenga recognized to the extent of giving him an option to purchase 1,265 shares for $10,000. Petitioner exercised the option in August 1936 and owned the shares until he disposed of them in the transaction giving rise to the issue here. The agreement in which the option was granted also settled salary questions between the parties. Petitioner always thought he should have a greater proportion of the stock of Interstate than the *234 1,265 shares he held, or 23 per cent of the total, in recognition of the services he was performing. He and Bylenga discussed the subject on numerous occasions and although the latter verbally promised to sell him additional shares, he never carried out his promises. The last of such promises was made a short time before November 2, 1939. By that time the operating revenue of Interstate had doubled since 1936. Petitioner intimated to Bylenga that he would resign his position unless he obtained a more equitable distribution of the corporation's stock. Bylenga declined to accede to petitioner's demands and petitioner, without receding from his claim of a right to more stock, accepted other terms, which were embodied in an employment contract executed on November 2, 1939. In 1936, 1937 and 1938 petitioner and Bylenga each received the same salary from Interstate. In 1939 petitioner was paid a salary of $25,000 and Bylenga about $17,000. The contract entered into on November 2, 1939, increased petitioner's salary from $25,000, to that amount plus 25 per cent of the net income of Interstate before Federal taxes, for a term of five years, subject to termination by either party on 30 days' *235 notice, and contained an option in favor of Bylenga and Interstate to purchase petitioner's stock during the term of the employment for $210,000. If Interstate discontinued petitioner's employment without his consent, it was obligated to purchase the stock at the same price. In the event petitioner died or his official relations with Interstate were terminated without his consent, Interstate and Bylenga were obligated to purchase the stock at the same price. A short time thereafter petitioner and Bylenga commenced negotiations with Seymour and others for the sale of all of their stock in a merger of transport corporations. The plan was abandoned after the Interstate Commerce Commission denied, in November 1940, an application of other corporations for a similar merger. Before the negotiations started, Bylenga informed petitioner, in effect, that he would waive his stock option rights during the negotiations to enable petitioner to obtain the highest possible price for the securities. During the summer of 1941 petitioner instituted negotiations, in which Bylenga subsequently joined, with Otis & Co., for the sale of Interstate stock. The dealings resulted in a conditional offer of *236 Otis & Co., made in September 1941, to purchase most of Bylenga's stock, after conversion in a recapitulation of Interstate, for about $300 a share for the then stock. Bylenga verbally agreed with petitioner to accept the offer but informed him a few days later that he would complete the transaction. He declined to give petitioner a reason for his final conclusion. Since entering into the employment contract in 1939, the operating revenue of Interstate had again doubled in amount under petitioner's management. The refusal of Bylenga to complete the transaction with Otis & Co., which, if it had been consummated as planned, would have given petitioner an opportunity to acquire and trade in stock of Interstate on a public market, was one of the reasons that caused petitioner to inform Bylenga in October 1941 of his intention to terminate his connection with Interstate and that Bylenga should purchase his stock for $300 a share, that being approximately the amount conditionally offered by Otis & Co. to Bylenga the previous month. Bylenga accepted petitioner's written offer to sell at that price. In connection with the transaction petitioner canceled his employment contract and entered *237 into a new one for a term of five years at an annual salary of $25,000, to perform such duties as are usually done by the chairman of a board of directors. In the meantime, Bylenga had arranged for the sale of 666 2/3 shares of the stock at the price to be paid by him and on the day the transaction with petitioner was closed, Interstate acquired the remaining shares from Bylenga at the same price for treasury stock. Except for the suspension by Bylenga of his and Interstate's option rights during the proposed merger of transport companies, to enable petitioner to deal without regard to the option, the option provisions embodied in the employment contract of November 2, 1939, were not at any time canceled or modified by an express promise of Bylenga. The inference, however, from the facts before us, is that Bylenga never intended to exercise the rights for himself or Interstate, over which he at all times had stock control. This is shown from actions of Bylenga. The option agreement provided for depositing the stock with a trustee for transfer to petitioner upon the expiration of his term of employment or to Bylenga or Interstate in the event they or either of them became obligated *238 to purchase the stock, and for other purposes embodied in a trust agreement to be executed. Bylenga declined to execute a trust agreement because of the pendency of negotiations with Seymour for the sale of all of the stock of Interstate. This indicates that prior to the conversation en route to New York, Bylenga concluded that petitioner should be placed in a position to deal with Seymour as an owner of the stock free of any option in his or Interstate's favor and uncomplicated by the provisions of a trust agreement. We find no reason to refuse to accept at its face value the testimony of petitioner in regard to the conversation. Bylenga took part in the negotiations with Seymour, in which petitioner dealt as absolute owner of the stock outstanding in his name. The actions of Bylenga in the negotiations with Seymour disclose a purpose not to exercise his option for Bylenga did not inform Seymour, and the latter did not ascertain from any other source, that an option existed with respect to the stock. The dealings of Bylenga with Otis & Co. in 1941 were consistent with the idea that he did not intend to take advantage of his option rights. The plan contemplated that petitioner would *239 retain all or most of the shares he held and that the acquisition by Otis & Co. would come out of holdings of Bylenga. The negotiations were initiated by petitioner, and, as in the dealings with Seymour, he dealt as absolute owner of the stock. When conducting negotiations with Bylenga in October 1941, Interstate considered the option as having been abandoned by Bylenga. The fact that Bylenga did not expressly exercise it, after counsel had informed him that the option, construed entirely under the terms of the agreement of November 2, 1939, was binding, is an indication that petitioner's belief was well founded. Regardless of the reasons Bylenga might have had for failure to assert a right to exercise the option according to the terms of the agreement of November 2, 1939, we do know from the evidence that petitioner set a price of $300 a share, an amount approximating the price Bylenga verbally agreed with petitioner to accept in the transaction with Otis & Co. the previous month, and that Bylenga considered the services of petitioner to be essential to the continued success of Interstate. Dealing with petitioner on the basis of such a sales price for his stock resulted in a new *240 employment contract for the performance of services by petitioner in an important capacity. Such benefit might reasonably have been a reason for Bylenga's action in not asserting his option rights, in accordance with the November 2, 1939, agreement. The purchase of stock involved no outlay of funds by Bylenga in view of the concurrent sales by him to Battjes, Hager and Interstate at the price he paid. It is significant that the negotiations resulting in the sale were initiated by petitioner at a time when he had serious doubt of the future of Interstate, if Bylenga persisted in carrying out operating policies with which petitioner was not in agreement, and that petitioner was of the opinion that he could earn as much income under other employment or in another enterprise. This discloses that petitioner did not regard his employment contract as having great value. The evidence clearly shows that Bylenga attributed much of the success of Interstate to the efficient services of petitioner as general manager and desired him to continue to serve the corporation, which petitioner agreed to do at the same basic salary but for different duties. Bylenga's estimate of the value of the services *241 of petitioner is shown by the effort he made to continue his employment. Until November 1, 1941, petitioner devoted all of his time to the affairs of Interstate, but the new employment contract entered into on November 10, 1941, did not contain such a requirement. The willingness of Bylenga to commit Interstate to the payment of a salary of $25,000 for part time duty is evidence that he regarded the full time services of petitioner to be worth more than that amount. This is also shown by the employment contract of August 15, 1942, and a subsequent offer made to petitioner. With Bylenga having no desire that Interstate cancel Bridge's contract, and never informing him of any such desire, it is not logical to believe that he paid $169,500 to cancel it. Bridge initiated the matter. He testified that he did not ask Bylenga to compensate him for the cancellation of his employment contract. The stock acquired by Bylenga had greater book value when acquired by him in November 1941 than when he obtained the option two years earlier. The earned surplus of Interstate increased about $282,000 from the close of 1939 to the close of 1941, of which about $65,000 was reflected in the stock *242 held by petitioner. Under the option agreement, earnings, whether accumulated or paid out in dividends, were to inure to the benefit of the optionee. This, considering the relations between the two men, is some, though not much, indication that the lower option price was not regarded in the deal made between them in October 1941. Other considerations contribute, in our opinion, even more to the conclusion that the entire $379,500 was paid only for stock, instead of $169,500 thereof for cancellation of petitioner's previous contract. The parties in the agreement actually bound themselves, in writing, to sell and purchase the stock for a consideration of $379,500, or $300 a share. Though, of course, we examine all facts to determine the reality of the transaction, the written terms are of clear weight. That there may have been intent to deal so as to affect taxes does not mean that the parties did not in fact sell and purchase the stock for the $379,500. They were under no duty to deal for the greatest tax benefit to the government, and if in actuality the deal was one of stock sold for $379,500, the petitioner should prevail here. Assuming that there was still outstanding an option *243 for purchase and sale of the stock at $210,000, that fact would not necessarily prove that the sale was conducted under the option. It could be altogether outside of that agreement, though obviously its existence raises some presumption in logic that it governed the sale. We conclude from all the facts that it did not. The fact that either petitioner or the company could, under the terms of the agreement of November 2, 1939, discontinue the employment upon 30 days' notice is to us a peculiarly strong indication that the sale was not in fact made under the option. No reason for so terminating employment was required. Upon so doing, the company was required to, and could, buy the stock for $210,000. Why then would Bylenga or the company spend $169,500 to be rid of a contract, from which the company could be free in 30 days, for nothing, merely by giving the requisite notice? The parallel query is: Why should the company pay $379,500 for stock which it might secure under an option for $210,000? But we think the latter question is much more easily answerable under the facts here. In the first place there is indication that there was at least question whether the option was, or was by *244 Bylenga considered, in effect. It had, as an integral part thereof, provided that the stock was to be placed in trust with the Michigan Trust Company, but Bylenga had declined to execute a trust agreement. The powers and duties of the trust company are referred to, in the contract of November 2, 1939, as more fully defined in the trust agreement of even date therewith, but do not otherwise appear of record here, except that dividends on the stock should be paid the trustee. Bylenga's refusal to execute the trust is, however, indication that he had duties thereunder. In these circumstances it is easily seen that Bylenga, in October 1941, had reason to think the option might, at least, not be enforceable, he not having followed it, in part; and this tends to corroborate petitioner's testimony as to Bylenga's release of the option. Anything tending to affect the enforceability of the option, in Bylenga's mind, would tend to explain the textual absence of any reference thereto in the offer of October 23, 1941; and clearly Bylenga did have reason to doubt its effect. In the next place, Bylenga was able to sell, and did sell, $200,000 worth of the stock at the same price paid petitioner, *245 so that to that extent it cost him nothing to make the substitution of stockholders. Again if the purchase had been made under the option, it would have been on a basis of partial payments over a period of four years, with interest at five per cent, instead of a cash payment, closing the matter at once without interest. Whether the interest rate was considered high does not appear, but it is apparent that the method taken disposed definitely and immediately of the old arrangement, and that the parties desired so to do. In any event, the difference in terms of payment, one payment instead of annually over four years, demonstrates that the option agreement was in fact not followed. It could not have been followed by the agreement actually made and consummated, because of the difference in terms. In addition, by the contract made, Bylenga acquired a two-year option to buy petitioner's stock in Acme Truck Rentals, and a position as director and vice president of that company. No separate consideration is expressed for such rights, but they were not involved in the exercise of the option given in 1939. It is apparent also that if the option had been exercised at $210,000, Interstate would *246 not thereby have had a right to the limited services by the petitioner, as was done by the agreement actually entered. The respondent does not contend that such agreement for his service at $25,000 per year, or the provision in that connection against petitioner's competition, had as consideration any part of the $379,500; in fact, upon brief, he says that the consideration was the $25,000 contract. This arrangement is then seen as actually worked out by a contract differing from the option, and as desired by Bylenga, in connection with a purchase of stock but for a different consideration. Again, we are impressed by the fact that the stock passed to Bylenga, and from him, at the same price, in effect, as involved in the Otis & Co. negotiations. Whether that represented the actual fair market value is not so important as the fact that the figure could have been obtained, had Bylenga not refused; therefore, it appears a figure reasonably to be used for the stock when Bylenga and petitioner began to deal. The two men had been associates. They came to the parting of the ways shortly after $300 a share could have been obtained. The petitioner was, of course, disappointed at Bylenga's refusal *247 to consummate a transaction under which there was opportunity for petitioner to sell his stock at about $300 a share. He, in effect, demanded, in his offer to Bylenga, that he be placed in the same position financially as if the Otis deal had been closed, and he had placed his stock on the market. The option was not mentioned, either orally or in the written agreement. No words as to its exercise were used. That the $300 per share was the consideration for stock is shown also by the fact that Battjes and Hager paid that amount. For Bylenga to have charged them $300 a share, for stock costing him only $166, approximately, a share, on respondent's theory, appears out of keeping with the fact that he was inviting them into the company. It certainly would have smacked of bad faith with them. Finally, we are particularly convinced of the unsoundness of respondent's theory that $169,500 was paid for the release of petitioner's contract, by the fact, above referred to in another connection, that it was mutually cancellable on 30-days' notice without reason. The respondent's reasoning is upon the assumption that the contract had several years to run, therefore was of such great value as reasonably *248 to explain payment of $169,500 for release. But being terminable in 30 days, obviously it had no such value to Bridge (even if he had so considered, and his statement that he did not is thus shown to be well based) and does not therefore offer reason for the price he set in his letter of October 23, 1941. For all of these reasons and in the light of all the facts before us, we conclude that the parties actually sold and purchased the stock, and that there was no exercise of the option. The respondent contends, in the alternative, that the amount received by petitioner in excess of $247,940, or $196 a share, is taxable as ordinary income. The contention is based upon the theory that the stock had a fair market value of $196 a share on October 31, 1941, as testified to by the valuation witness of the respondent at the hearing. The valuation witness of petitioner valued the stock at from $403 to $471 a share as of November 1, 1941. There is no evidence in the record to establish that the parties agreed upon $196 a share as the value of the stock. If, as we conclude, the agreement was one of sale of stock, it is immaterial whether it was at a fair price. Furthermore, we regard the *249 price offered by Otis & Co. and paid by Battjes and Hager as better evidence of the value of the stock than the opinions expressed by the witnesses of petitioner and the respondent. Careful consideration of all of the evidence convinces us that the entire consideration of $379,500 was paid by Bylenga for the stock. It follows that petitioner correctly reported the gain in his return. Decision will be entered under Rule 50.